**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108-3551
Telephone: (619) 233-7770
Facsimile:  (619) 297-1022

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

| | |
|---|---|
| **VINCENT WONG and NAGASUBRAHMANYAM KUMMARAGUNTA, Individually and On Behalf of All Others Similarly Situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**LENOVO (UNITED STATES), INC., a Delaware Corporation; and SUPERFISH, INC., a Delaware Corporation**<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1) **VIOLATIONS OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701, ET SEQ;**<br>2) **VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2522; AND**<br>3) **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

*//*

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

# INTRODUCTION

1. Plaintiff VINCENT WONG ("Plaintiff Wong") and Plaintiff NAGASUBRAHMANYAM KUMMARAGUNTA ("Plaintiff Kummaragunta") (collectively as "Plaintiffs") bring this Class Action Complaint against Defendant LENOVO (UNITED STATES), INC. ("Lenovo") and Defendant SUPERFISH, INC., ("Superfish") (collectively as "Defendants") for Defendants' unauthorized infiltration and surveillance of millions of unsuspecting consumers' personal computers. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

2. Each year, millions of consumers buy computers from Lenovo, trusting the company to provide reliable, secure computers. Unfortunately, in September 2014, Lenovo betrayed that trust by partnering with Superfish—an aspiring leader in the "visual search engine" market—to install a monitoring application (the "Superfish Surveillance Software") on Lenovo computers sold to consumers.

3. The privacy implications of Defendants' Superfish Surveillance Software cannot be overstated. As an initial matter, Defendants install "root certificates"[1] on the affected computers to ensure unimpeded access to consumers' internet traffic. However, Defendants' root certificates were so poorly implemented that they effectively bar consumers from securing *any* internet transaction—even after Defendants' software is removed.

4. Once Defendants have placed their root certificate on the computers, their Superfish Surveillance Software installs a program that reroutes consumers' internet traffic. A consumer's request to visit a website, for example, no longer heads straight to its destination; instead, Defendants' Superfish

---

[1] "Root certificates" are more fully explained in ¶¶ 19-26 of this Complaint.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

Surveillance Software intercepts the request, performs searches and analysis, endeavors to modify the contents, and then re-sends the request to the original destination.

5. Then, when the consumer's computer receives a response from a website's servers, Defendants' Superfish Surveillance Software intercepts that as well. Once intercepted, the Software forever alters the contents by injecting custom computer code into the response in an effort to display advertisements.

6. By installing and operating their Superfish Surveillance Software without consent, Defendants have violated the privacy rights of millions of individuals. In addition, the manner in which Defendants' Superfish Surveillance Software operates violates several federal laws that aim to protect consumers against such unauthorized access to their communications and computers.

7. Accordingly, Plaintiff Wong and Plaintiff Kummaragunta, each on their own behalf and on behalf of a Class of similarly situated individuals, bring this lawsuit seeking to compel Defendants to remove their Superfish Surveillance Software and root certificates from Plaintiffs' and the Class' computers, as well as recover statutory and actual damages, costs, and attorneys' fees.

## PARTIES

8. Plaintiff Wong is a natural person who resides in the State of New York.

9. Plaintiff Kummaragunta is a natural person who resides in the State of Illinois.

10. Defendant Lenovo (United States), Inc., is a corporation existing under the laws of the State of Delaware with its principal place of business located at 1009 Think Place, Morrisville, North Carolina 27560. Lenovo does business throughout the United States, the State of California, and this District.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

11. Defendant Superfish, Inc., is a corporation existing under the laws of the State of Delaware with its principal place of business located at 2595 East Bayshore Road, Palo Alto, California 94303. Superfish does business throughout the United States, the State of California, and this District.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court has personal jurisdiction over Defendants because they reside in this District,[2] conduct business in this District, and the improper conduct alleged in this Complaint occurred in or emanated from this District.

13. The Court has personal jurisdiction over Defendants and venue is proper in this District because the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from California, and because Defendants transact significant amounts of business within this District, enter into consumer and business contracts here, and Defendant Superfish is headquartered in this District.

## INTRADISTRICT ASSIGNMENT

14. Pursuant to Civil Local Rule 3-2(e), this case shall be assigned to the San Jose Division.

## FACTUAL BACKGROUND

I. **Lenovo Partners with Superfish to Surreptitiously Install Surveillance Software on Millions of Computers.**

15. Defendant Lenovo is a leading manufacturer and seller of consumer personal computers, selling millions of computers and laptops every year.

---

[2]        Defendant Lenovo operates a "Research and Product Development Center" within this District, located at 602 Charcot Avenue, San Jose, California 95131, that "function[s] as a developmental lab and corporate office." *Lenovo opens New Office in Silicon Valley News in - November 06, 2013 - at Lenovo*, http://www.lenovocareers.com/en/news-and-events/career-news-description/lenovo-opens-new-office-in-silicon-valley--412?cntry=united-states (last visited Feb. 23, 2015).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

16. Defendant Superfish is a company that envisages itself being the premier provider of image-based search results. Superfish employs dozens of engineers and scientists that work to teach computers how to recognize objects, such as animals, shoes, or smartphones, within images.

17. In 2014, Defendants partnered to pre-install Superfish's software onto millions of Lenovo computers. Through that partnership, Defendants devised a system whereby they profited by monitoring, intercepting, and monetizing the communications of millions of consumers.[3] Unfortunately, none of the monitored consumers were ever aware of the Superfish Surveillance Software's very existence.

## II.   Defendants Modify Users' Computers and Reroute Their Internet Traffic Without Their Consent.

18. Prior to January 2015, neither Lenovo nor Superfish disclosed to consumers that the Superfish Surveillance Software would modify their computers and monitor their online activities, nor did the Defendants ever seek to (or actually) obtain consumers' consent before doing so. Indeed, immediately after the user completes the initial setup of Windows, Defendants' Superfish Surveillance Software installs a "root certificate" that puts users' private information at risk and a "local proxy," that, as explained in detail below, intercepts users' communications.

### A.   Defendants Install an Insecure Root Certificate.

19. On every Lenovo computer with the Superfish Surveillance Software installed, Defendants also installed a "root certificate" that eviscerates users' abilities to securely communicate over the internet.

---

[3]   According to Superfish's "Non-exclusive Software Distribution Agreement," Superfish enters into "Revenue Shar[ing]" partnerships with distributors. *Superfish Inc. ("Superfish") Non-Exclusive Software Distribution Agreement*, www.similarproducts.net/ SuperfishWebsiteDistributionAgreementV6US.pdf (last visited Feb. 23, 2015). Ostensibly, Lenovo and Superfish entered into a similar agreement, where Lenovo, acting as the distributor, would receive "50%" of revenue generated "from redirections to alternate sites made by [the Superfish Surveillance Software] during each month." *Id.*

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

20. In very basic terms, a root certificate is part of an intricate system that helps ensure that websites on the internet are secure. The Windows operating system comes pre-packaged with a store of root certificates issued by trustworthy Certificate Authorities such as VeriSign.[4]

21. A Certificate Authority, such as VeriSign, distributes certificates to trustworthy companies like Amazon.com. When an individual browses Amazon.com, the user's web browser identifies a certificate that was "signed" by VeriSign, and the individual is given assurance that the website (Amazon.com) is secure. Without this system, it would be extremely difficult, if not impossible, for users to verify which websites were secure and safe for the transmission of sensitive information, such as credit card and bank account numbers.

22. Certificate Authorities like VeriSign must follow stringent regulations to have their root certificate included in web browsers or operating systems. For example, Microsoft requires entities applying for root certificates to comply with rigorous guidelines delineated by the WebTrust for Certification Authorities program, which is sponsored by the American Institute for Certified Public Accountants (AICPA).

23. To average users, the significance of a root certificate is most readily manifested by a small image of a padlock in the top left of a web browser that appears when conducting secure transactions over the internet. This image provides the individual with peace of mind that sensitive information can be transmitted to the website without interception by nefarious actors. However, because Defendants install their own root certificate (without following any guidelines), the image of the padlock appears unbroken even while the Superfish Surveillance Software intercepts and captures all secure

---

[4]   VeriSign is a company that specializes in, among other things, online security and digital certificates. To date, VeriSign is the largest provider of digital certificates.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

communications.

24. To install their root certificate (the "Superfish Root Certificate"), Defendants utilize a product called the "Komodia SSL Digestor" that "allows the programmer [*i.e.*, Defendants] a transparent access to decrypted [secure internet traffic] … without raising an alert from the [user's] browser." Komodia, the seller of the Digestor, states that it is:

> "a modified Man In The Middle attack. What it does is 'talk' with the application [*e.g.*, an internet browser] on one side, and talking with the target server on the other [*e.g.,* Amazon.com's servers], and the [Digestor] being the man in the middle, just as someone who gets a secret whispered in each ear, normally the browser/app would raise an alert because of the modified certificate, but the [Digestor] installs a root [] certificate in advance which means the browser will not send an alert because the certificate created is legit from [the application's] point of view."

25. Just as Komodia described, Defendants' Superfish Surveillance Software and their Root Certificate creates a "Man In The Middle Attack," which is a well-known type of attack used by, amongst others, computer hackers,[5] spy agencies,[6] and foreign governments[7] to eavesdrop on private communications and steal confidential information.

26. Worse, Defendants designed their software to leave behind the Superfish Root Certificate even after a monitored consumer uninstalls the Superfish Surveillance Software.[8] The risks caused by untrusted root certificates are

---

[5]   *DoubleDirect: Hackers Redirect High-Traffic Sites Via New MITM Attack*, http://www.tripwire.com/state-of-security/latest-security-news/doubledirect-hackers-redirect-high-traffic-sites-using-new-man-in-the-middle-attack/ (last visited Feb. 23, 2015).
[6]   *NSA disguised itself as Google to spy, say reports – CNET*, http://www.cnet.com/news/nsa-disguised-itself-as-google-to-spy-say-reports/ (last visited Feb. 23, 2015).
[7]   *Chinese government launches man-in-middle attack against iCloud [Updated] | Ars Technica*, http://arstechnica.com/security/2014/10/chinese-government-launches-man-in-middle-attack-against-icloud/ (last visited Feb. 23, 2015).
[8]   After public condemnation, Lenovo released an automated tool that purportedly removes the Superfish Surveillance Software from infected computers. *Lenovo Newsroom | Updated Lenovo Statement on Superfish*, http://news.lenovo.com/article_display.cfm?article_id=1931&view_id=1431& (last visited Feb. 23, 2015). However, Lenovo's tool does not remove the Superfish Surveillance Software from infected computers' "recovery disk." The recovery disk is provided by Lenovo to act as a backup of the Windows operating system in

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

well documented and Defendants' actions pose serious risks to monitored consumers' computer systems.[9]

27. For example, just days after the Superfish Surveillance Software was uncovered, a computer security expert publicly released a tool that "silently intercept[s] [secure] connections made from computers infected with Superfish malware" by exploiting Defendants' insecure root certificate.[10] Anyone using that tool at an airport, coffee shop, or another public place can eavesdrop on the confidential conversations of the potentially millions of consumers with the Superfish Surveillance Software still installed on their computers.

**B.      Defendants Install a "Local Proxy" to Reroute Internet Traffic.**

28. After Defendants' Superfish Surveillance Software installs its root certificate, the software causes all of the user's internet traffic to pass through a "local proxy," which is a computer program that changes the destination of all outbound internet traffic and initially receives all in-bound internet traffic. That is, a computer with a local proxy running will have a request to Amazon.com initially pass through the local proxy before it reaches the original destination of Amazon.com's servers.

//

---

case a user suffers a critical failure or seeks to install a fresh installation of Windows. As a result, should Plaintiffs or members of the putative Class actually use the recovery disk, the Superfish Surveillance Software will once again infect their computers.

[9]     Hackers use untrusted root certificates such as Defendants' Superfish Root Certificate to intercept personal data from users without detection. Because the consumer mistakenly believes that the transaction is secure, he or she assumes that it is safe to input sensitive financial or other information. Armed with the "key" to Defendants' Superfish Root Certificate, a hacker can create the faux appearance of a secure transaction. Defendants, as the Superfish Root Certificate's authors know the key, but, and perhaps more troubling, the key Defendants chose was simply the word "komodia." Accordingly, the prospect that Defendants (or anyone else) may attempt to utilize the root certificates they have intentionally left behind on monitored consumers' computers is a very real threat.

[10]     *0xPoly/Superphish · GitHub*, https://github.com/0xPoly/Superphish (last visited Feb. 23, 2015); *see also Errata Security: Exploiting the Superfish certificate*, http://blog.errratasec.com/2015/02/exploiting-superfish-certificate.html#.VOqBqlPF87N (last visited Feb. 23, 2015).

29. Defendants' local proxy is their version of a product sold by non-party Komodia, which is marketed as a "redirector product" ("Komodia Redirector"). The Komodia Redirector lets Defendants "redirect [] traffic" away from the user's intended recipient and "to the proxy service."[11] "When a connection is made" by the user, the Komodia Redirector determines whether a specific communication "should be intercepted" and then intercepts and reroutes the communications to the local proxy.[12]

30. Analyzing the Superfish Surveillance Software reveals that Defendants purchased the Komodia Redirector and integrated it into their Superfish Surveillance Software. And because Defendants previously installed the root certificate onto every affected Lenovo laptop, the Superfish Surveillance Software can (and does) read and alter the contents of the intercepted communications.

## III. Defendants' Superfish Surveillance Software Reads and Alters the Contents of Consumers' Rerouted Internet Traffic.

### A. Defendants Acquire the Contents of Consumers' Communications

31. Defendants' claimed purpose of pre-installing the Superfish Surveillance Software on consumers' computers was to "to assist customers with discovering products similar to what they are viewing."[13] To provide that "assistance," the Superfish Surveillance Software obtains access to consumers' browsing sessions, determines what, if anything, the consumer is viewing, and communicates with Defendants' servers to offer the "similar" products that consumers can "discover."

32. The method by which Superfish Surveillance Software obtains access to

---

[11] *Komodia's Redirector – Komodia*, https://web.archive.org/web/20140807112859/http://www.komodia.com/wiki/index.php/Komodia%27s_Redirector (last visited Feb. 23, 2015).
[12] *Id.*
[13] *Superfish Vulnerability - Lenovo Support (US)*, http://support.lenovo.com/us/en/product_security/superfish (last visited Feb. 23, 2015).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

consumers browsing sessions is described in <u>Section II</u> above. Once the Superfish Surveillance Software establishes the "man-in-the-middle attack," Defendants are in a position to view a consumer's online browsing and communication activity and to determine what product, if any, the consumer is looking at.

33. Defendant Superfish describes its process for determining what consumers are looking at as first "tak[ing] an image," "convert[ing] it to a model," "filter[ing] billions of images," "retriev[ing] visually similar results," and then presenting the most similar product to the user:



<u>FIGURE 1</u>.[14]

The process outlined above in <u>Figure 1</u> occurs, in part, on the user's computer and also on Defendants' servers. The Superfish Surveillance Software continuously communicates with Defendants' servers to, among other things, "filter" and "retrieve visually similar results."

34. Defendants also use the millions of instances of the Superfish Surveillance Software to collect a vast amount of information about consumers and their internet browsing habits. According to Superfish's public statements, the Superfish Surveillance Software collects "usage data, referring/exit pages

---

[14]  *About Us | SimilarProducts - Monetize Visually*, http://www.similarproducts.net/about-us/ (last visited Feb. 23, 2015) (describing Defendant Superfish's functionally equivalent "SimilarProducts" product which may be incorporated in whole or in part in Defendants' Superfish Surveillance Software).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

and URLs, platform types, number of clicks, etc."[15] Superfish then conducts "data mining"[16] to identify trends, habits, and patterns in consumers' browsing.

35. According to the terms of Superfish's standard distribution agreement, Defendants developed "an identifying electronic signature that [] contain[s] DLsource and UserID that [] enable[s] Superfish to track installations and un-installations of the App, searches and merchant clicks."[17] The plethora of consumer information collected by the Superfish Surveillance Software and analyzed by Superfish is valuable to Defendants because they can sell or exchange the collected data to or with "interested third parties."[18]

**B.  Defendants Alter the Contents of Consumers' Communications**

36. As described above, Defendants' implementation of the Komodia Redirector decrypts all encrypted data so that the Superfish Surveillance Software can read the contents of the communications. Once the Superfish Surveillance Software has processed the contents, Defendants' Komodia Redirector encrypts the data once again to ensure that the receiving server (the indented recipient of the original communication) receives an encrypted communication as expected. The same decryption-encryption process occurs in reverse when the infected computer receives secure communications.

37. As such, any communication made or received by an infected computer is always altered. Specifically, Defendants' Superfish Surveillance Software replaces a user's default root certificate (that was securely signed by a

---

[15] *Privacy Policy | SimilarProducts - Monetize Visually*, http://www.similarproducts.net/privacy-policy/ (last visited Feb. 23, 2015).

[16] *Michael Chertok | ZoomInfo.com*, http://www.zoominfo.com/p/Michael-Chertok/1433596671 (reprinting that Defendant Superfish's Chief Technology Officer, Michael Chertok, has "10 years of experience in building large scale real-time data mining systems.").

[17] *Superfish Inc. ("Superfish") Non-exclusive Software Distribution Agreement*, http://www.similarproducts.net/SuperfishWebsiteDistributionAgreementV6US.pdf (last visited Feb. 23, 2015).

[18] *Privacy Policy | SimilarProducts - Monetize Visually*, www.similarproducts.net/privacy-policy/ (last visited Feb. 23, 2015).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

trusted source) with the Superfish Root Certificate (which, conversely, is completely insecure and untrusted), forever changing all communications originated from users' computers. Moreover, all communication is decrypted before it reaches its intended recipient, another wholesale modification.

38. In addition, Defendants' Superfish Surveillance Software seeks to inject custom computer code into users' browsing sessions to display advertisements. After the Superfish Surveillance Software obtains access to a user's communications and determines what product (if any) a consumer is looking at, it transmits information to Superfish's servers and receives a list of similar products to advertise to the user. The Superfish Surveillance Software then "injects" bespoke computer code to display the advertisements on any website viewed by the user.

39. For example, when a website, such as Amazon.com, transmits computer code to a user's computer to facilitate online shopping, the code and accompanying files are temporarily stored before, during, and a short time after the user views and interacts with the site. But in the time before the user views the website, and while the code is temporarily stored, the Superfish Surveillance Software executes its injection function to modify the code.

40. Figure 2 below shows a portion of the source code for Amazon.com that facilitates the operation of the website. In this example, the Superfish Surveillance Software has not injected any of Defendants' code.



**FIGURE 2.**

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

41. Figure 3 below shows the same code from Amazon.com and demonstrates how just some of Defendants' code is injected, which is highlighted by a red box.



**FIGURE 3.**

42. The result of the injected computer code is similar to what is shown in Figure 4 below. In that case, the user is looking at shoes, and the Superfish Surveillance Software's code causes a "pop-up" "WindowShopper" box to appear showing eight similar shoes available for purchase online. Per the likely terms of Defendants' agreement, had the consumer purchased one of the recommended similar shoes, each Defendant would profit.

**FIGURE 4.** [19]

---

[19] *Visual Search for your Toolbar or Add-on | SimilarProducts - Monetize Visually*, http://www.similarproducts.net/enroll/ (last visited Feb. 23, 2015) (showing the result of injected computer code created by Defendant Superfish's "WindowShopper" program that is functionally equivalent to Defendants' Superfish Surveillance Software.)

**IV.** **Computer Security Experts and Government Officials Discover Defendants' Superfish Surveillance Software and are Outraged.**

43. It was not until January 23, 2015 that Lenovo, after receiving consumer complaints, confirmed that it had installed the Superfish Surveillance Software on certain of its laptops.[20] Lenovo stated at the time:

> "Due to some issues (browser pop up behavior for example), with the Superfish Visual Discovery browser add-on, we have temporarily removed Superfish from our consumer systems until such time as Superfish is able to provide a software build that addresses these issues. As for units already in market, we have requested that Superfish auto-update a fix that addresses these issues."

44. Just weeks later, Lenovo updated its response because the situation apparently "evolved." Lenovo pointed consumers to a "Lenovo Security Advisory" that stated that the "SUPERFISH VULNERABILITY" Defendants had installed on millions of computers was, in truth, a "Man-in-the-Middle Attack" of "High" "Severity."[21]

45. Since then, computer security experts have explained why Defendants' scheme was bad from the start. One stated that:

> "Now injecting ads into a browser is bad enough, doing so by running an HTTPS proxy on the machine is a lot worse. HTTPS shouldn't be touched unless it is for a very good reason - inserting ads is never a good reason.
>
> But what makes it still orders of magnitude worse than that, is that their proxy uses the same certificate on all affected (or, perhaps more accurate, infected) PCs. Hence anyone can obtain the private key of the certificate - which, as people have already showed, isn't rocket science - and use this to man-in-the-middle HTTPS traffic without the Lenovo user being aware."[22]

46. Another expert said:

> "The latest Superfish debacle highlights the current strategy for device manufacturers across the electronics ecosystem looking

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

---

[20]    *Id.*
[21]    *Superfish Vulnerability - Lenovo Support (US)*, http://support.lenovo.com/us/en/product_security/superfish (last visited Feb. 23, 2015).
[22]    *Feedback Friday: Lenovo Preinstalled Superfish Adware on Laptops – Reactions | SecurityWeek.Com*, http://www.securityweek.com/feedback-friday-lenovo-preinstalled-superfish-adware-laptops-%E2%80%93-reactions (last visited Feb. 23, 2015).

to get their slice of the billion-dollar advertising revenue market that has made Google and others so successful. Unfortunately, like the case with Lenovo and many others, users' privacy and security are compromised - often in secret - leaving them extremely vulnerable to malicious hackers who leverage the this type of tracking technology against them."[23]

47. Even the United States government has determined that Defendants' Superfish Surveillance Software is a security threat. US-Cert, a website operated by the United States Computer Emergency Readiness Team, a division of the Department of Homeland Security, released an "Alert" on February 20, 2015 and warned:

> "Starting in September 2014, Lenovo pre-installed Superfish VisualDiscovery spyware on some of their PCs. However, Superfish was reportedly bundled with other applications as early as 2010. This software intercepts users' web traffic to provide targeted advertisements. In order to intercept encrypted connections (those using HTTPS), the software installs a trusted root CA certificate for Superfish. All browser-based encrypted traffic to the Internet is intercepted, decrypted, and re-encrypted to the user's browser by the application – a classic man-in-the-middle attack. Because the certificates used by Superfish are signed by the CA installed by the software, the browser will not display any warnings that the traffic is being tampered with. Since the private key can easily be recovered from the Superfish software, an attacker can generate a certificate for any website that will be trusted by a system with the Superfish software installed. This means websites, such as banking and email, can be spoofed without a warning from the browser."[24]

48. Ultimately, Defendants profited for months on the unauthorized acquisition and alteration of consumers' private internet communications. Undeniably, Defendants' methods demonstrate a wholesale disregard for consumer privacy rights and violate numerous federal laws.

## FACTS RELATING TO PLAINTIFF WONG

49. On February 14, 2015, Plaintiff Wong purchased a Lenovo Yoga 2 Pro laptop from Lenovo.com and paid approximately $950.00. Unknown to Plaintiff Wong at the time he ordered it, his Lenovo Yoga 2 laptop was secretly bundled with Defendants' Superfish Surveillance Software.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

---

[23] *Id.*
[24] *Id.*

50. As soon as Plaintiff Wong received his laptop in the mail, several days after February 14, 2015, Plaintiff Wong began using his computer and connected it to a local wireless network and the internet. Plaintiff Wong has since then regularly used the laptop to browse the internet, send and receive emails, shop online, and conduct online banking.

51. On or about February 23, 2015, Plaintiff Wong was alerted by news reports stating that the Superfish Surveillance Software was likely installed on his laptop. Once he confirmed that the Superfish Surveillance Software was present on his laptop, Plaintiff Wong searched online on how to remove it and the Superfish Root Certificate and did just that.

52. Thus, from on or about February 16, 2015 to February 23, 2015, the Superfish Surveillance Software was operating on his computer, intercepting all of his internet traffic, and attempting to inject unwanted advertisements into his browsing sessions.

53. Plaintiff Wong never agreed to any terms or conditions regarding the Superfish Surveillance Software, nor was he aware that the Lenovo laptop he purchased would contain the Superfish Surveillance Software. Accordingly, Plaintiff Wong never consented to Defendants' monitoring of, access to, and/or interception of his internet communications.

## FACTS RELATING TO PLAINTIFF KUMMARAGUNTA

54. On or about December 1, 2014, Plaintiff Kummaragunta purchased a Lenovo Y50 laptop from Newegg.com and paid approximately $1,119.00. Unknown to Plaintiff Kummaragunta at the time he ordered it, his Lenovo Y50 laptop was secretly bundled with Defendants' Superfish Surveillance Software.

55. After Plaintiff Kummaragunta received his laptop on December 1, 2014, Plaintiff Kummaragunta began using his computer and connected it to a local wireless network and the internet. Plaintiff Kummaragunta has since

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

then regularly used the laptop to browse the internet, send and receive emails, shop online, and conduct online banking.

56. On or about February 26, 2015, Plaintiff Kummaragunta was alerted by an e-mail from Newegg.com that Superfish Surveillance Software was likely installed on his laptop and that it may pose a security risk. Once Plaintiff Kummaragunta confirmed that the Superfish Surveillance Software was present on his laptop, Plaintiff Kummaragunta followed the steps provided in the e-mail and removed the Superfish Surveillance Software rom his laptop using the Lenovo removal tool.

57. Thus, from on or about December 1, 2014 to late February 2015, the Superfish Surveillance Software was operating on his computer, intercepting all of his internet traffic, and attempting to inject unwanted advertisements into his browsing sessions.

58. Plaintiff Kummaragunta never agreed to any terms or conditions regarding the Superfish Surveillance Software, nor was he aware that the Lenovo laptop he purchased would contain the Superfish Surveillance Software. Accordingly, Plaintiff Wong never consented to Defendants' monitoring of, access to, and/or interception of his internet communications.

## CLASS ALLEGATIONS

59. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and on behalf of all others similarly situated ("the Class").

60. Plaintiffs represent, and are each members of, the Class consisting of:

> All individuals in the United States who purchased a Lenovo computer with the Superfish Surveillance Software pre-installed on it and who connected the computer to the internet.

61. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2)

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

62. **Numerosity:** On information and belief, hundreds of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendants' records, discovery, and other third party sources.

63. **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and each member of the Class purchased laptops that was preinstalled with the Superfish Surveillance Software and had their communications read and altered without consent. Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

64. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the members of the Class sustained damages arising out of Defendants' wrongful conduct.

//

65. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a) Whether Defendants intentionally designed their Superfish Surveillance Software to reroute and alter consumers' internet traffic;

b) Whether Defendants intentionally installed an insecure root certificate that remains installed even after consumers remove Defendants' software;

c) Whether Defendants' obtained consent before installing and operating their Superfish Surveillance Software;

d) Whether Defendants' conduct described herein violated the Stored Communications Act (18 U.S.C. §§ 2701, *et seq.*);

e) Whether Defendants' conduct described herein violated the Electronic Communications Privacy Act (18 U.S.C. §§ 2510–22.); and

f) Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

66. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION

### Violations of the Electronic Communications Privacy Act

### (18 U.S.C. §§ 2510–22.)

### (On Behalf of Plaintiffs and the Class)

67. Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

68. The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–22 ("ECPA") broadly defines an "electronic communication" as "any transfer

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12).

69. By using the Superfish Surveillance Software to intercept and modify Plaintiffs' and the Class's online browsing activity, Defendants endeavored to and did intercept communications between Plaintiffs' and the Class members' computers on the one hand, and the servers for the websites they browsed on the other.

70. Thus, Defendants intentionally obtained and/or intercepted, by device or otherwise, these electronic communications, without the knowledge, consent or authorization of Plaintiffs and the Class.

71. Accordingly, Defendants' conduct violated 18 U.S.C. § 2511(1)(a) because they intentionally intercepted and endeavored to intercept Plaintiffs' and the Class members' electronic communications.

72. Defendants likewise violated 18 U.S.C. § 2511(1)(d) by intentionally using the contents of Plaintiffs' and the Class members' electronic communications (*i.e.*, their online browsing activity) that they intercepted using the Superfish Surveillance Software.

73. Plaintiffs and the Class suffered harm as a result of Defendants' violations of the ECPA, and therefore seek (a) preliminary, equitable and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and the profits obtained by Defendants as a result of their unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

//
//
//

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

**SECOND CAUSE OF ACTION**

**Violations of the Stored Communications Act**

**(18 U.S.C. §§ 2701, *et seq.*)**

**(*In the Alternative to the First Cause of Action*)**

**(On Behalf of Plaintiffs and the Class)**

74. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

75. The ECPA broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12). The Stored Communications Act incorporates this definition.

76. Pursuant to the ECPA and Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.* ("SCA"), "electronic storage" means any "temporary storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A). This type of electronic storage includes communications in intermediate electronic storage that have not yet been delivered to their intended recipient.

77. The SCA mandates, among other things, that it is unlawful for a person to obtain access to stored communications on another's computer system without authorization. 18 U.S.C. § 2701.

78. Congress expressly included provisions in the SCA to address this issue so as to prevent "unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public." S. Rep. No. 99–541, 35, 1986 U.S.C.C.A.N. 3555, 3589.

//

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

79. Defendants accessed facilities through which electronic communications services are provided through their Superfish Surveillance Software. Specifically, Plaintiffs' and the Class members' computers provide electronic communications services that include operating as printer servers and wireless networking providers (*e.g.*, with Bluetooth or WiFi), amongst others.

80. In addition, Plaintiffs' and the Class members' computers operated as remote terminals of third-party facilities through which electronic communications are provided. Modern web applications communicate in near real-time over the internet, meaning that when Plaintiffs and the Class access such web applications by visiting web pages, their internet browsers act as portals to the facilities that provide electronic communications services, such as electronic bulletin boards, electronic mail servers, and computer server centers.

81. Through the Superfish Surveillance Software, Defendants accessed Plaintiffs' and the Class members' web browsing communications (*i.e.*, their browsing activity) while those communications were in temporary storage on their laptop computers.

82. Accordingly, Defendants violated 18 U.S.C. § 2701(a)(1) by accessing without authorization facilities through which an electronic communication service is provided (*i.e.*, web services connected to Plaintiff's and the Class's computers), and obtaining and altering their web browsing communications.

83. Further, Defendants violated 18 U.S.C. § 2701(a)(2) by exceeding the scope of any authorization granted to access Plaintiffs' computers and thereby obtaining and altering their web browsing communications.

84. Additionally, Defendants have violated 18 U.S.C. § 2701(a)(2) because they intentionally exceeded authorization to access consumers' communications

and obtained, altered, or prevented authorized access to a wire or electronic communication while in electronic storage by their continued modification of users' secure internet connections, even after users uninstalled the Superfish Surveillance Software. Defendants had actual knowledge of, and benefited from, this practice.

85. Because Defendants programmed the Superfish Surveillance Software to operate for profit on Plaintiffs' and the Class members' computers, they had knowledge of, and benefitted from, their unlawful conduct.

86. As a result of Defendants' conduct described herein and its violation of § 2701, Plaintiffs and the Class have suffered injuries to their privacy rights, and economic harm due to Defendants' unjust enrichment at their expense.[25] Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendants' conduct described herein and awarding them the maximum statutory and punitive damages available under 18 U.S.C. § 2707.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Class)

87. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

88. Plaintiffs and members of the Class conferred a monetary benefit on Defendants. Defendants received and retained money by selling to their customers and business partners data collected from Plaintiffs' and the Class

---

[25]     To date, Plaintiff Wong's recovery hard disk, which he paid for as a part of the purchase price of his Lenovo Yoga 2 laptop, is still infected with the Superfish Surveillance Software and cannot be altered by Plaintiff Wong. As such, Plaintiff Wong requires an injunction to compel Defendants to replace his recovery hard disk with a version that does not contain the Superfish Surveillance Software. Also, to date, Plaintiff Kummaragunta's recovery hard disk, which he paid for as a part of the purchase price of his Lenovo Y50 laptop, is still infected with the Superfish Surveillance Software and cannot be altered by Plaintiff Kummaragunta. As such, Plaintiff Kummaragunta requires an injunction to compel Defendants to replace his recovery hard disk with a version that does not contain the Superfish Surveillance Software.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

members' computers through their Superfish Surveillance Software and/or by selling advertisements that were injected into Plaintiffs' and the Class members' web browsers. The advertisements were injected and all of the information was collected from Plaintiffs and the Class without authorization and through deceptive business practices.

89. Additionally, Plaintiffs and the Class members conferred a monetary benefit on Defendant Lenovo through the purchase of their Lenovo computers.

90. Defendants appreciate or have knowledge of such benefit, as demonstrated by their public representations regarding the monetization of Plaintiffs' and the Class members' online consumer activity.

91. Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained by selling information about or advertisements to Plaintiffs and members of the Class, which Defendants have unjustly obtained as a result of their unlawful actions.

92. Accordingly, Plaintiffs and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class pray for the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint both Plaintiffs as class representatives, and appoint their counsel as class counsel;

B.    Declare that Defendants' actions, as described herein, violate the Electronic Communications Privacy Act (18 U.S.C. §§ 2510–22), and the Stored Communications Act (18 U.S.C. §§ 2701, *et seq.*), and constitute unjust enrichment;

//

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

C.      Award injunctive and other equitable relief as is necessary to protect the interests of the Plaintiffs and the Class, including, *inter alia*: (i) an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein; (ii) requiring Defendants to delete their Superfish Root Certificate and Superfish Surveillance Software from infected computers and their recovery disks; and (iii) requiring Defendants to conspicuously and truthfully display the manner in which they collect and share data about monitored consumers.

D.      Award damages, including:

    i.      the greater of (a) the sum of actual damages suffered plus any profits Defendants earned through their unlawful conduct, and (b) the greater of $100 per member of the Class, per day of Defendant's violations, or $10,000 per member of the Class, pursuant to 18 U.S.C. § 2520(c)(2);

    ii.     the greater of (a) the sum of actual damages suffered plus any profits Defendants earned through their unlawful conduct, and (b) $1,000 per member of the Class; and

    iii.    punitive damages where applicable, to Plaintiffs and the Class, in an amount to be determined at trial;

E.      Award Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

F.      Award Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G.      Award such other and further relief as equity and justice may require.

//
//
//
//
//

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

**DEMAND FOR JURY TRIAL**

93. Plaintiffs hereby demand a trial by jury for all issues so triable.


Dated: March 31, 2015                    Respectfully submitted,

                                          **KAZEROUNI LAW GROUP, APC**


                              By:   /s/ Abbas Kazerounian
                                    Abbas Kazerounian, Esq.
                                    Mona Amini, Esq.
                                    Attorneys for Plaintiffs

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626